Clifford E. **HARBRIDGE**

v.

**GREYHOUND LINES, INC.**

**Civ. A. No. 36547.**

United States District Court
E. D. Pennsylvania.

Jan. 14, 1969.

Nathan I. Miller, Philadelphia, Pa., for plaintiff.

Albert S. Shaw, Jr., Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JOHN W. LORD, Jr., District Judge.

This is an action for damages resulting from an alleged slander of the plaintiff, Clifford E. Harbridge, by his former employer, defendant Greyhound Lines, Inc.

Plaintiff's complaint is in three parts:

(1) He claims general and special damages caused to him by the alleged publication of oral defamatory accusations in the presence of third parties in 1964;

(2) demand for unpaid wages due plaintiff from the date of the first alleged slander to the date of his discharge from employment by the defendant-employer; as well as three weeks' unpaid vacation salary; and

(3) funds due him under a company retirement plan.

Defendant, Greyhound, has asserted a counterclaim for damages arising out of a shortage of funds in a change fund in the custody of plaintiff.

The Court makes the following

## FINDINGS OF FACT

1. For a period of approximately 7 months prior to April 8, 1964, the plaintiff was the terminal manager of defendant's terminal located at 17th and John F. Kennedy Boulevard, in the City and County of Philadelphia, Commonwealth of Pennsylvania (N.T. p. 22).

2. Prior to becoming terminal manager, he had been designated as a regular dispatcher in New York City, then he was made a full-time dispatcher and supervisor at the Philadelphia terminal, and in the latter part of 1962, he was designated as chief dispatcher and assistant superintendent of the Philadelphia terminal (N.T. p. 21).

3. Immediately prior to the plaintiff becoming terminal manager of the Philadelphia terminal, his immediate predecessor was Jay Hill, who prior to his temporary appointment as terminal manager, had been an assistant terminal manager and supervisor (N.T. p. 23).

4. Upon the appointment of plaintiff as terminal manager, Mr. Hill returned to his prior position as assistant terminal manager (N.T. p. 23).

5. Richard Weller at said time was also an assistant terminal manager (N. T. p. 23).

6. At the date of plaintiff's appointment as terminal manager, Mr. Newsom was superintendent of the Philadelphia terminal and the plaintiff's immediate superior officer (N.T. p. 21).

7. Mr. Newsom resigned and Mr. Ivins then became the superintendent of the Philadelphia terminal at the time of plaintiff's continuing position as terminal manager (N.T. p. 23).

8. Mr. Ivins, as superintendent of the Philadelphia terminal, was plaintiff's immediate superior (N.T. p. 24).

9. The superintendent of the Philadelphia terminal had charge of the drivers, all other supervisory personnel connected with operations, the maintenance of the department in Philadelphia, and the terminal operation (N.T. p. 24).

10. As part of plaintiff's duties, he was in charge of what is titled the change fund. This was a fund placed in the custody of the terminal manager for the purpose of running the terminal, making change available to the ticket agents, to the baggage clerks and express clerks. It consisted in the main of changing bills into quarters, dimes and nickels, so that at all times the agents would have change funds in their respective tills (N.T. p. 24).

11. Upon plaintiff's appointment as terminal manager, he received from Mr. Newsom, the superintendent, a set of keys who at said time advised him that similar sets were held by Messrs. Jay Hill and Richard Weller, as well as Andrew Mager, Paul Petak, the assistant terminal managers, as well as the superintendent, and that such had been the prior custom. The change fund was kept within a safe consisting of a series of locked cabinets or drawers; which change fund was kept in 4 boxes of said safe each requiring a key (N.T. p. 29).

12. Plaintiff made audits, weekly and bi-monthly (N.T. p. 30).

13. The agents had their own boxes in said safe to which they maintained their own key and of which there were 13 boxes, all contained in the same safe (N.T. p. 34).

14. On a regular basis, plaintiff audited the respective boxes of the ticket sellers and baggage clerks, and that when same was done, it was in the presence of the ticket agent (N.T. p. 35).

15. On plaintiff's appointment as terminal manager, he signed a custody receipt for the monies then making up the so-called change fund (N.T. p. 41).

16. Although the dial on the safe was broken, they were obliged to keep the door of the safe open so that the various assistant terminal managers would have access to the change fund (N.T. pp. 44–45).

17. On March 24, 1964, plaintiff attended a baggage meeting being held in New York City and returned to the terminal that same evening (N.T. pp. 48–49), returning to the terminal to pick up his car.

18. Edgar Bosley was assistant regional manager of the New York office which took in the Philadelphia terminal (N.T. p. 51).

19. Company auditors were on the premises the 24th and 25th of March, 1964, and said auditors were out of the Cleveland office (N.T. p. 53).

20. On March 26th, plaintiff was told by Messrs. Jay Hill and Richard Weller that the auditors had found a shortage in the change account (N.T. p. 55).

21. On the morning of March 26, 1964, a conference was held in the presence of Mr. Hill, Mr. Weller, Mr. Bosley,

Mr. Ivins, Mr. McCann, and a Mr. Steinhart (N.T. p. 56).

22. During the course of his investigation of the change fund shortage, E. F. Bosley conferred with and questioned plaintiff on a number of occasions on March 25 and 26, 1964. The first of these sessions was in the office of D. R. Ivins, Supervisor of the Philadelphia terminal. Present were Bosley, Ivins, plaintiff, and two auditors who discovered the shortage, and Jay J. Hill and Weller, assistant terminal managers (N. T. pp. 301, 220, 56). This meeting was a meeting of supervisory personnel (N. T. p. 226). All of the persons present had a direct interest in the investigation of the change fund shortage. There is no evidence that any outsiders or employees of Greyhound not having a direct interest in the investigation were present at this meeting.

23. Subsequent to the initial meeting, E. F. Bosley questioned plaintiff on several occasions (N.T. p. 410). There is no evidence that any outsiders or employees of Greyhound not having a direct interest in the investigation were present at any of these meetings (N.T. p. 411).

24. No person other than Bosley questioned plaintiff or made any statements to plaintiff with respect to the shortage during the course of this investigation (N.T. p. 89).

25. Bosley, at no time during any of these meetings, made the following statements attributed to him by plaintiff:

(a) "You, Harbridge, were a party to the theft of our change fund; you were aware of the shortages and tried to cover them up.";

(b) did not at any time accuse plaintiff of embezzling the change fund;

(c) did not at any time accuse plaintiff of being a party to embezzlement or theft of the change fund;

(d) did not at any time accuse plaintiff of theft of the change fund;

(e) did not at any time discuss the reasons for plaintiff's discharge with anyone outside the staff of Greyhound except Charles Lorenz as a business reference for employment;

(f) did not at any time state that plaintiff "was aware of the shortage and tried to cover up said embezzlement."; and

(g) did not at any time orally accuse plaintiff of complicity in the crime of embezzlement.

26. After plaintiff was discharged by Greyhound he was hired by C. D. Lorenz, an old friend and former Greyhound employee, who was then President of Grey Line Motor Tours (N.T. p. 63).

27. Prior to the time he hired plaintiff, Lorenz was advised by Bosley that "Mr. Harbridge was in the process of being terminated as a result of a shortage in the change fund at the Philadelphia terminal" (N.T. p. 70).

28. The statement by Bosley referred to in Finding No. 27 hereof was true. This was also stated to Lorenz by plaintiff.

29. On April 2, 1964, plaintiff placed a call to Mr. Lesko, defendant's Regional Manager in New York, from plaintiff's home in New Jersey (N.T. p. 87).

30. During the course of the telephone call referred to in Finding of Fact No. 29, plaintiff's wife placed her ear near the telephone so that she could overhear the conversation between plaintiff and Lesko. This was done without notice to or knowledge of Lesko. During this conversation, Mr. Lesko made the following statement:

"We intend to recover these funds. If we have to prosecute you criminally for embezzlement we will do so."

31. Mr. Bosley suggested to plaintiff to take a lie detector test to save plaintiff from embarrassment which plaintiff agreed to take (N.T. p. 58).

32. Two bus drivers, Paul C. Halsey and B. Rosenberry were told by "night dispatchers", Gene Meenan and Lou

Abrusio that plaintiff was discharged for handling company funds.

33. Mr. Bosley did at no time cause the reason for plaintiff's discharge to be publicized among personnel of the Greyhound Corporation; specifically he did not at any time mention this to any dispatcher in the defendant organization.

34. There is no evidence that any other official of Greyhound made such publication.

As to the plaintiff's demand for unpaid wages and vacation pay due him, the Court makes the following

## ADDITIONAL FINDINGS OF FACT

35. Plaintiff at the time of his discharge was being paid a salary of $175.00 per week plus the fringe benefits of three weeks' paid vacation and the benefits flowing to him from the retirement fund of which he was a member.

36. On March 26, 1964, plaintiff was temporarily relieved of his duties as terminal manager until further investigation (N.T. p. 78).

37. He was not finally and officially terminated of his employment until after a telephone call made by the plaintiff to Mr. Lesko, followed by the receipt of the written communication from Mr. Lesko dated April 7, 1964.

38. After ten years of service, the contractual employees, including plaintiff, were receiving three weeks' paid vacation.

39. Plaintiff's vacation was not on a fixed time, but was taken in off periods known as the slow season.

40. Plaintiff did not receive his vacation for the year 1963.

As to funds allegedly due the plaintiff from the retirement fund of which he was a member, the Court makes the following

## ADDITIONAL FINDINGS OF FACT

41. Under the Greyhound Employees Retirement Income Plan and the Greyhound Disability Plan, of which plaintiff was a member, it is provided that "an employee whose services terminated before retirement for any reason other than death is entitled to have his contributions returned to him * * * with interest. * * *"

42. Plaintiff is entitled to these funds plus interest as provided in the Plans.

As to defendant's counterclaim for damages arising out of the change fund of which plaintiff had custody, the Court makes the following

## ADDITIONAL FINDINGS OF FACT

43. There is no proof or evidence that any part of the shortage was taken by plaintiff, nor is there any proof that he was negligent in the manner in which he handled the change fund. In view of the easy access of others to the change fund, it would be unjust to charge plaintiff for repayment of the shortage.

## CONCLUSIONS OF LAW

1. In an action in the Federal Courts for slander allegedly committed in Pennsylvania, Pennsylvania law is controlling. Bocchicchio v. Curtis Publishing Co., 203 F.Supp. 403, 409 (E.D. Pa.1962). The Pennsylvania Courts have consistently adhered to the definitions and rules set forth in the Restatement of Torts in slander and defamation cases.

2. In order to create liability for defamation there must be an unprivileged publication of false and defamatory matter. Restatement, Torts, § 558.

3. In Pennsylvania, pursuant to the Act of August 21, 1963, P.L. 1291, 12 P.S. § 1584a, plaintiff, in an action for defamation, has the burden of proving the defamatory character of the communication, its publication by defendant, the recipients' understanding of its defamatory meaning, and any special harm resulting to plaintiff from its publication.

4. In Pennsylvania, pursuant to the Act of August 21, 1963, P.L. 1291, 12 P.S. § 1584a, defendant in an action for defamation has the burden of proving

the truth of the communication and the privileged character of the occasion on which it was uttered if these defenses are raised.

■ 5. Plaintiff failed to establish the publication of false or defamatory matter with respect to the telephone conversation between plaintiff and defendant's Regional Manager, Lesko, allegedly overheard by plaintiff's wife, if believed for the following reason:

(a) Since the wife allegedly overheard the conversation without notice to Lesko, Lesko's statements were not published, as a matter of law.

■■ 6. In order to create liability for defamation there must be publication to a person other than the plaintiff. Restatement of Torts, §§ 558, 577. A publication of the defamatory matter is essential to liability. Publication can be either intentional or by negligent communication. (Restatement, Torts, § 577, Comment a.). Lesko's Statements clearly were not intentionally communicated to the wife since he did not know the wife was listening. The statements were not negligently communicated to the wife since Lesko had no reason to suspect that the wife was listening. The accidental communication of matter defamatory of another to a third person is not a publication. Thus, an act which is not intended to communicate to a third person matter which is defamatory and which does not create an unreasonable risk of such communication is not a publication. (Restatement, Torts, § 578, Comment n.).

■ 7. Plaintiff failed to establish the publication of false or defamatory matter with respect to the conversations between C. D. Lorenz and three Greyhound officials, for the following reasons:

(a) The only statement made to Lesko to which plaintiff conceivably could object was the statement, made by Bosley, that "Harbridge was in the process of being terminated as a result of a shortage in the change fund * * *"

(b) The evidence, including plaintiff's own testimony, conclusively established that this statement was true. Truth is a complete defense. Restatement, Torts, § 582.

■ 8. Plaintiff failed to establish the publication of false or defamatory matter with respect to any of the statements allegedly made by Bosley during the course of the investigation of the change fund shortage, for the following reasons:

(a) Plaintiff's testimony with respect to the utterance of defamatory statements by Bosley during the course of the investigation is not worthy of belief. All of the witnesses who testified for defendant, including Messrs. Bosley, McCann and Steinheart, denied having heard any such statements. More significant, plaintiff's own witness, J. J. Hill, denied hearing any such statements.

(b) To the extent that such statements were made to plaintiff alone, they were not actionable since they were not published to a third person. Restatement, Torts, § 577.

(c) Defendant has met its burden of proving that all statements made by Bosley were uttered on a conditionally privileged occasion.

9. The only persons allegedly present when Bosley made the statements referred to in 8 hereof were the auditors who discovered the shortage, Ivins, a supervisor, and Hill and Weller, assistant terminal managers. The subject of the utterances was the change fund shortage in which all persons present had a direct interest. No outsiders or other employees of defendant were shown to be present. The occasion, therefore, was conditionally privileged within the meaning of the relevant Pennsylvania and federal cases, including:

Campbell v. Willmark Service System, 123 F.2d 204 (3rd Cir. 1941)

Rankin v. Phillips, 206 Pa.Super. 27, 211 A.2d 56 (1965)

Pritchard v. Wenger, 268 Pa. 114, 110 A. 726 (1920)

Russell v. Pennsylvania Mutual Ins. Co., 118 Pa.Super. 351, 179 A. 798 (1935)

 One who allegedly publishes false and defamatory matter is not liable therefor if it is published on a conditionally privileged occasion. Restatement, Torts, § 558. An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know. Restatement, Torts, § 596.

10. Plaintiff failed to establish the publication of false and defamatory matter with respect to any statements allegedly made by dispatchers in the terminal to former bus drivers Halsey and Rosenberry, for the following reasons:

(a) Defendant, a corporation, is not responsible, as a matter of law, for idle statements allegedly made by dispatchers in the terminal, there being no evidence that the dispatchers were acting in the scope of employment in making the statements and there being no evidence that the dispatchers were officials of the Company or managerial personnel with authority to speak for the Company.

(b) The evidence clearly indicates that the statements allegedly made by the dispatchers had nothing to do with the duties of the dispatchers. Furthermore, the evidence clearly indicates that no official or supervisor of defendant disclosed any information to the dispatchers concerning plaintiff or authorized the dispatchers to speak concerning plaintiff. Compare Sias v. General Motors Corp., 372 Mich. 542, 127 N.W.2d 357 (1964).

11. Mr. Bosley's suggestion to plaintiff to take a lie detector test was

(a) not defamatory in nature, and

(b) uttered on a conditionally privileged occasion.

12. Under the facts and law, judgment will be entered for defendant, Greyhound Lines, Inc., on the complaint in slander.

13. Plaintiff is due unpaid salary for three weeks, March 15, 1964 to April 8, 1964 in the sum of $525.00.

14. Plaintiff is due vacation pay for three weeks for the year 1963, preceding his termination of employment, in the sum of $525.00.

15. Plaintiff is due retirement benefits plus interest in the total sum of $3,665.56.

16. Plaintiff is not liable for any shortage in the change fund. Defendant's counterclaim is rejected by the Court.